James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Stuart A. Davidson
Alexander C. Cohen
**ROBBINS GELLER RUDMAN**
   **& DOWD LLP**
120 East Palmetto Park Rd., Suite 500
Boca Raton, FL  33432
(561) 750-3000

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: AMERICAN FINANCIAL RESOURCES, INC. DATA BREACH LITIGATION | Civil Action No. 22-1757 (MCA) (JSA)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT and**<br>**<u>DEMAND FOR JURY TRIAL</u>** |

      Plaintiffs Dora Micah ("Micah"), Sharon Styles ("Styles"), Matthew Stuart ("Stuart"), and Anthony A. Oliva, PhD ("Dr. Oliva") (collectively, "Plaintiffs"), individually and on behalf of all those similarly situated (the "Class" or "Class Members"), upon personal knowledge of the facts pertaining to themselves, upon information and belief as to all others, and upon the investigation conducted by their counsel, bring this Consolidated Class Action Complaint ("Complaint") against Defendant American Financial Resources, Inc. ("AFR" or "Defendant") to obtain damages, restitution, and injunctive relief, and in support thereof, state as follows:

## NATURE OF THE ACTION

1.      This action arises from AFR's failure to properly secure, safeguard, and adequately destroy the sensitive personal identifiable information that was entrusted to it by Plaintiffs and Class Members during the course of its business operations.  The types of information at issue include, but not limited to: Plaintiffs' and Class Members' names, Social Security numbers, driver's license or state-issued identification numbers, and financial account numbers (collectively, "Sensitive Information" or "PII").

2.      AFR is a mortgage lending company that provides real estate lending services to thousands of mortgage brokers, bankers, lenders, homeowners, home buyers, realtors, and contractors across the country.

3.      Plaintiffs and Class Members include current and former loan customers of AFR; current and former loan customers of an AFR affiliated institution that shared Plaintiffs' and Class Members' PII with AFR during the course of providing lending or real estate services; and current and former employees of AFR.

4.      As part of its services, AFR requires that its customers, including Plaintiffs and Class Members, provide AFR with their PII, including, but not limited to, names, Social Security numbers, and driver's license information.

5.      As part of the terms of employment, AFR requires that its employees, including at least Plaintiff Styles and Class Members, provide AFR with their PII, including, but not limited to, names, Social Security numbers, and driver's license information.

6.      As a lending institution that maintains the PII of Plaintiffs and Class Members, Defendant owed Plaintiffs and Class Members numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to

- 2 -

keep Plaintiffs' and Class Members' PII confidential, safe, secure, and protected from unauthorized disclosure, access, dissemination, or theft.

7.      Indeed, during the course if its business operations, Defendant expressly and impliedly promised to safeguard Plaintiffs' and Class Members' PII.

8.      Furthermore, by obtaining, collecting, using, retaining, and deriving benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to Plaintiffs and Class Members and knew or should have known that it was responsible for safeguarding and protecting Plaintiffs' and Class Members' PII from unauthorized disclosure access, dissemination, or theft.

9.      Plaintiffs and Class Members provided their PII to AFR with the reasonable expectation of privacy and mutual understanding that AFR would comply with its legal duties, obligations, and representations to keep such information confidential, safe, and secure.

10.     Plaintiffs and Class Members further reasonably expected and relied upon Defendant to only use their PII for business purposes, implement reasonable retention and data destruction policies, and to make only authorized disclosures of this information.

11.     Plaintiffs and Class Members would not have paid the amounts of money they paid for Defendant's services, or surrendered their PII, had they known their information would be maintained using inadequate data security and retention systems.

12.     AFR's data security obligations were particularly important given the substantial increase in data breaches preceding the date of the Data Breach.

13.     Defendant, however, breached its duties, promises, and obligations, and Defendant's failures to honor its obligations increased the risk that Plaintiffs' and Class Members' Sensitive Information would be compromised in the event of a likely cyberattack.

- 3 -

14.     Indeed, Defendant's systems did suffer such a fate, and a criminal cyber-attack successfully targeted and accessed Defendant's systems and files that contained Plaintiffs' and Class Members' PII.  Upon information and belief, as a result, Plaintiffs' and Class Members' PII was exfiltrated, stolen, disseminated on the Dark Web, and misused to commit identity theft crimes.

15.     Beginning on or about March 9, 2022, AFR notified state Attorneys General and/or many of its loan customers about a widespread data breach involving the sensitive PII of thousands of individual loan customers ("Notice Letter").[1] As an example, AFR notified the New Hampshire Attorney General on March 11, 2022 that there were 954 Massachusetts residents affected by the breach.[2] AFR similarly notified the Washington Attorney General on March 11, 2022 that there were 6,570 Washington residents impacted by the breach, including current or former employees of AFR.[3]  Following  a forensic investigation, which concluded on February 4, 2022, AFR explained through its Notice Letter that, between December 6-20, 2021, AFR allowed its network to be "accessed without authorization" by unknown third parties, exposing and allowing access to, and acquisition of, the PII for individual customers detailed above ("Data Breach").[4]

---

[1]   Ex. 1, March 9, 2022 letter from William S. Packer, AFR's Executive Vice President and Chief Operations Officer to Matthew Stuart ("March 9, 2022 Letter").

[2]   Letter from Joseph L. Bruemmer, Baker Hostetler, to Attorney General John Formella, Office of the Attorney General of New Hampshire (Mar. 11, 2022), https://www.doj.nh.gov/consumer/security-breaches/documents/american-financial-resources-20220311.pdf.

[3]   Letter from Joseph L. Bruemmer, Baker Hostetler, to the Office of the Washington Attorney General (Mar. 11, 2022), https://agportal-s3bucket.s3.amazonaws.com/databreach/BreachM13162.pdf.

[4]   March 9, 2022 Letter.

16.     Presaging the harm that Defendant knew would befall victims of its Data Breach, the Notice Letter also advised Plaintiffs and Class Members "to remain vigilant by reviewing your account statements and credit reports for any unauthorized activity."

17.     Notably, while the Data Breach occurred from December 6, 2021 through December 20, 2021, AFR purportedly did not determine what information was accessed until February 4, 2022.  Compounding the risk to Plaintiffs and Class Members, AFR then failed to promptly notify the impacted individuals – ultimately, sending the data breach notifications over one month later, an unreasonable amount of time from any objective measure.

18.     Currently, the full extent of the types of sensitive personal information, the scope of the breach, and the root cause of the Data Breach are all within the exclusive control of Defendant and its agents, counsel, and forensic security vendors at this phase of litigation.

19.     Upon information and belief, Defendant is responsible for allowing this Data Breach because of multiple acts of negligence, including but not limited to: its failure to design, implement, and maintain reasonable data security systems and safeguards; and/or failure to exercise reasonable care in the hiring, supervision, training, and monitoring of its employees and agents and vendors; and/or failure to comply with industry-standard data security practices; and/or failure to comply with federal and state laws and regulations that govern data security and privacy practices and are intended to protect the type of Sensitive Information at issue in this action; and/or failure to design, implement and execute reasonable data retention and destruction policies.

20.     Upon information and belief, despite its role in managing so much Sensitive Information, Defendant failed to take basic security measures such as adequately encrypting its data or following industry security standards to destroy PII that was no longer necessary for the intended business purpose.  Moreover, Defendant failed to recognize and detect that unauthorized

third parties had accessed its network in a timely manner to mitigate the harm.  Defendant further failed to recognize that substantial amounts of data had been compromised, and more likely than not, had been exfiltrated and stolen.  Had Defendant not committed the acts of negligence described herein, it would have discovered the Data Breach sooner – and/or prevented the invasion and theft altogether.

21.     In this era of frequent data security attacks and data breaches, particularly in the financial industry, Defendant's failures leading to the Data Breach are particularly egregious, as this Data Breach was highly foreseeable.

22.     Upon information and belief, based on the type of sophisticated and malicious criminal activity, the type of PII targeted, Defendant's admission that the PII was accessed, Defendants' admission that Plaintiffs and Class Member's PII was in the files that were accessed, reports of criminal misuse of Plaintiffs' and Class Members' data, and reports of PII on the Dark Web following the Data Breach, Plaintiffs' and Class Members' PII was likely accessed, disclosed, exfiltrated, stolen, disseminated, and used by a criminal third party.

23.     As a result of the Data Breach, Plaintiffs and the Class Members are at an imminent risk of identity theft.

24.     The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that Plaintiffs' and Class Members' PII was targeted, accessed, and has been disseminated on the Dark Web.  Moreover, Class members have suffered actual identity theft and misuse of their data following the data breach.

25.     As Defendant instructed, advised, and warned in its Notice Letters, Plaintiffs and the Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud.  Plaintiffs' and Class Members' have heeded such warnings to mitigate

- 6 -

against the imminent risk of future identity theft and financial loss.  Such mitigation efforts included, and will include into the future:  reviewing financial statements; changing passwords; and signing up for credit and identity theft monitoring services.  The loss of time and other mitigation costs are tied directly to guarding against and mitigating against the imminent risk of identity theft.

26.     Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including:  (a) invasion of privacy; (b) financial costs incurred mitigating the mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f)  loss of time heeding Defendant's warnings and following its instructions in the Notice Letter; (g) the loss of benefit of the bargain (price premium damages), to the extent Class Members paid AFR for services; (h) deprivation of value of their PII; and (i) the continued risk to their Sensitive Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Sensitive Information.

27.     Plaintiffs seek to remedy these harms, and to prevent the future occurrence of an additional data breach, on behalf of themselves and all similarly situated persons whose PII was compromised as a result of the Data Breach.  Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement for loss of time, reimbursement of opportunity costs, out-of-pocket costs, price premium damages, and injunctive relief including improvements to Defendant's data security systems and protocols, future annual audits, and adequate credit monitoring services funded by the Defendant.

28.     Plaintiffs bring this Class Action Complaint against Defendant seeking redress for its unlawful conduct, asserting claims for: (a) negligence; (b) negligence *per se*; (c) breach of confidence; (d) intrusion upon seclusion; (e) breach of implied contract; (f) unjust enrichment; (g) violations of New Jersey state consumer protection statutes; (i) violations of Florida, Maryland, and Illinois state consumer protection statutes; and (j) declaratory judgment.

## PARTIES

29.     Plaintiff Dora Micah is a citizen of the state of Maryland and resides in Frederick, Maryland.  Plaintiff Micah is a consumer who was a customer of Defendant and provided her personal information and PII to Defendant.  Defendant notified Plaintiff Micah of the Data Breach and the unauthorized access of her PII by sending her a Notice of Data Breach letter, dated March 9, 2022.

30.     Plaintiff Sharon Styles is a citizen of the state of Pennsylvania and resides in Philadelphia, Pennsylvania.  Plaintiff Styles was employed by the Defendant and provided her personal information and PII to Defendant in connection with her employment.  Defendant notified Plaintiff Styles of the Data Breach and the unauthorized access of her PII by sending her a Notice of Data Breach letter, dated March 9, 2022, which she did not receive until April 4, 2022.

31.     Plaintiff Matthew Stuart is a resident and citizen of Illinois residing in Cook County, Illinois.  Plaintiff Stuart is a consumer who was a customer of Defendant and provided his personal information and PII to Defendant.  Plaintiff Stuart received AFR's Notice of Data Breach, dated March 9, 2022, shortly after that date.

32.     Plaintiff Anthony A. Oliva, PhD, is a citizen of the state of Florida and resides in West Miami, Florida.  Dr. Oliva is a consumer who was a customer of Defendant and provided his personal information and PII to Defendant.  Dr. Oliva received AFR's Notice of Data Breach,

dated March 9, 2022, shortly after that date.

33.     Defendant American Financial Resources, Inc. is a New Jersey corporation, and maintains its principal place of business at 9 Sylvan Way, Parsippany, New Jersey, 07054.

34.     All of Plaintiffs' claims stated herein are asserted against AFR and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION AND VENUE

35.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member (including, for example, named Plaintiff Stuart, a citizen of Illinois) is a citizen of a state different from Defendant (a citizen of New Jersey) to establish minimal diversity.

36.     The District of New Jersey has personal jurisdiction over Defendant named in this action because Defendant is incorporated and has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and otherwise has substantial contacts with this District and purposely availed themselves to the Courts in this District.

## DEFENDANT'S BUSINESS AND PROMISES

37.     AFR operates its business nationwide offering residential financing services to mortgage brokers, bankers, lenders, homeowners, home buyers, realtors, and contractors.

38.     In doing so, AFR holds itself out as a full-service mortgage lender, working in wholesale, correspondent, and consumer direct channels.  AFR offers a variety of financial options, including FHA, VA, USDA, Ginnie Mae, Fannie Mae, and Freddie Mac.  In addition, AFR is a

top lender in 203(k) lending for sponsored originations and is one of the nation's leading renovation and manufactured home lenders.  In providing these services, AFR offers an extensive program suite, and "cutting-edge technology."

39.     AFR further holds itself out to be "a group of trusted, innovative, and responsive mortgage professionals who . . . bring a dedicated focus to simplify the lending process."

40.     In the course and scope of its residential financing business, AFR collects massive amounts of highly sensitive PII, including but not limited to, Social Security numbers, employment information (including tax returns, W-2's, pay stubs, and letters regarding employment history), credit histories and letters regarding credit events, investment information, addresses, dates of birth, and driver's license information.

41.     AFR has acknowledged the sensitive and confidential nature of the PII. To be sure, collecting, maintaining, and protecting PII is vital to many of AFR's business purposes.

42.     AFR acquired Plaintiffs' and Class Members' PII as part of its residential mortgage financing business, and AFR collected and stored the PII for commercial gain.

43.     As a condition of their using the services of AFR, consumers were obligated to provide AFR with certain PII, including their name, date of birth, address, Social Security number, driver's license, telephone number, email address, financial account numbers, and payment card numbers.

44.     Plaintiffs and Class Members entrusted their PII to AFR, or AFR affiliate, on the premise and with the understanding that AFR would safeguard their information, use their PII for business purposes only, not disclose their PII to unauthorized third parties, and/or only retain PII for necessary business purposes and for a reasonable amount of time.

45.     AFR has acknowledged the sensitive and confidential nature of the PII.  To be sure, collecting, maintaining, retaining, and protecting PII is vital to many of AFR's business purposes. Furthermore, AFR has acknowledged through conduct and statements the PII should only be used for a "legitimate business purpose, that the misuse or inadvertent access, disclosure or unauthorized dissemination of PII can pose major privacy and financial risks to impacted individuals, and that under state law they may not disclose and must take reasonable steps to protect PII from improper release or disclosure.

46.     For example, with respect to Social Security numbers, AFR states in its Privacy Policy that:

> Social Security numbers are classified as "Confidential" information under the AFR Information Security Policy. As such, Social Security numbers may only be accessed by and disclosed to AFR employees and others with a legitimate business "need to know" in accordance with applicable laws and regulations. Social Security numbers, whether in paper or electronic form, are subject to physical, electronic, and procedural safeguards, and must be stored, transmitted, and disposed of in accordance with the provisions of the Information Security Policy applicable to Confidential information. These restrictions apply to all Social Security numbers collected or retained by AFR in connection with customer, employee, or other relationships.[5]

47.     With respect to privacy in general, AFR states that it is "committed to your financial well-being and protecting the privacy and security of the information you share with us since our inception in 1997."[6]

---

[5]     AFR, Privacy Statement (Feb. 1, 2021), https://www.afrcorp.com/privacy-statement/.

[6]     *Id*.

48.     AFR also makes public representations on its website regarding what information it shares:[7]

> We may share information with service providers with whom we work, such as data processors and companies that help us market products and services to you. When permitted, or required by law, we may share information with additional third parties for purposes including response to legal process.

> When you submit a loan application to us, we may ask for information that may include where you work, what you do, your income, assets, debts and obligations, your financial goals and other similar information. We use this information when evaluating your eligibility for a loan. This evaluation also requires us to obtain information about you from others such as consumer reporting agencies (also known as credit bureaus), the IRS, licensed title search companies, and your hazard and/or flood insurance company.

> In addition, American Financial Resources, Inc. may provide third party firms with information furnished by you, such as names, addresses and the financial information you have provided to us or that we have obtained from others about you. Any use of this information will be restricted to advancing your request for a loan, locating a home, or the marketing of other financial products American Financial Resources, Inc. may offer. We will never sell information about you to any other organization.

> We may also provide certain information to others when legally required to do so (for instance, in response to a subpoena), to prevent fraud, or to comply with a request by a government agency or regulator.

49.     Plaintiffs and the Class Members, as current and former AFR customers, current and former customers of an AFR affiliate, or AFR employees, relied on these expressed and implied promises and on this sophisticated entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, to implement reasonable retention policies, to limit access to authorized individuals, and to make only authorized disclosures of this information.

---

[7]     *Id.*

## THE DATA BREACH AND DEFENDANT'S RESPONSE

50.     Beginning on or about March 9, 2022, AFR notified many of its customers, current and former employees, and state Attorneys General about a widespread data breach involving sensitive PII of certain current and former customers.

51.     Through an investigation, AFR determined that a third-party criminal or criminals accessed its systems between December 6 and 20, 2021 (*i.e.*, unauthorized access over 14 calendar days).[8]  The investigation further determined that Plaintiffs' and thousands of Class Members' PII were present within the files that were accessed.

52.     Thus, for two weeks, unauthorized third parties had access to AFR's trove of highly sensitive and PII without detection.

53.     Upon information and belief, the PII was not encrypted or was not adequately encrypted prior to the data breach.

54.     The confidential information that was accessed without authorization included names along with data elements including Social Security numbers, account numbers, "and for some individuals, driver's license number[s]."[9]

55.     In response to the Data Breach, rather than promptly inform its customers and employees, AFR waited for over a month after the discovery of the Data Breach, on March 9, 2022 to issue notice.  Even then, AFR did not fully disclose the scope of the Data Breach, but opted to issue a vague letter leaving the Plaintiffs and Class Members without a full understanding of how the breach occurred or what happened to their PII once it was accessed.  For example, the latter

---

[8]     March 9, 2022 Letter.

[9]     *Id.*

fails to mention or provide any conclusive determination as to whether or not the information was exfiltrated, stolen or taken during the Data Breach, a fact that Plaintiffs and Class Members are entitled to know.

56.     In fact, there is no indication by AFR that the investigation concluded that Plaintiffs' and Class Members' PII was safe or that the Data Breach was limited to a mere viewing of the PII, as opposed to theft or exfiltration.  To the contrary, the Notice Letter leaves a strong inference that the PII was not only fully accessed but that the data was likely exfiltrated and disseminated in the attack.

57.     Emsisoft, an award-winning malware-protection software company, states that "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence, especially during the preliminary stages of an investigation."[10]

58.     Consistent with Emsisoft, AFR issued an express warning and advised the impacted individuals of the seriousness of the attack, and that they should "remain vigilant." The Notice Letter further issued specific instructions and mitigation techniques such as "reviewing account statements" for "unauthorized activity" – AFR specifically stated:

> We wanted to notify you of the incident and assure you that we take it very seriously. We also encourage you to remain vigilant by reviewing your account statements and credit reports for any unauthorized activity. If you see charges or activity you did not authorize, please contact your financial institutions immediately.

59.     These warnings and instructions are an acknowledgment by AFR that it is not only plausible that the criminals acquired the PII for criminal purposes, thereby placing the impacted

---

[10]   Emsisoft Malware Lab, The chance of data being stolen in a ransomware attack is greater than one in ten (EMSISOFT BLOG July 13, 2020), https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/.

customers at an imminent threat of identity theft and financial fraud – but that the theft and dissemination and misuse of the PII is the highly probable result of this type of cyberattack.

60.     Without the likelihood of dissemination and misuse, and materialization of identity theft, the warnings and instructions to mitigate the risk would be unnecessary and would cause more harm than good, and Defendant would not have advised such actions that would cost Plaintiffs and Class Members time and money.

61.     As an additional line of protection, AFR created and paid for a program that offered identity theft protection to Class Members. Absent an actual, materialized, and imminent threat to the Plaintiffs and Class Members, such a program would also have been unnecessary and a waste of Defendant's time and money.   Defendant would not have spent resources creating such a program without the likelihood that the Class Member PII was exfiltrated and disseminated in the attack, and that a materialized and imminent risk of identity theft was present for all Class Members.  AFR stated:

> Additionally, AFR is offering you a complimentary one-year membership to Kroll's identity monitoring services. This service helps detect possible misuse of your personal information and provides you with identity monitoring services focused on immediate identification and resolution of identity theft. . . .[11]

62.     Finally, AFR also acknowledged implementing improvements to its systems stating, "we have implemented additional measures to enhance our security protocols."  These measures included deploying a new advanced endpoint detection and response tool, resetting user passwords, upgrading server and domain controller software, and enhancing multifactor authentication.[12]

---

[11]   March 11, 2022 letter to the Attorney General of New Hampshire, *supra* n.2.

[12]   *Id.*

63.     While AFR admits that enhanced "security protocols" were required to improve its data security systems, there is no indication based solely on the Notice Letter whether these steps are fully adequate to protect Plaintiffs' and Class Members' PII going forward, as the source and root cause of the data breach were not disclosed and remain unknown and undiscoverable absent litigation.[13]

64.     What is evident and indisputable is that the Data Breach resulted in the unauthorized access of Defendant's systems and files, and  that those compromised files contained the PII of Plaintiffs and thousands of Class Members (AFR consumers and employees), including their names, Social Security numbers, and driver's license numbers.

65.     Upon information and belief, the cyberattack was targeted at AFR and Plaintiffs' and Class Members' PII due to AFR's status as a major real estate mortgage lending company that collects valuable personal and financial data on its many customers, as well as its employees.

66.     Upon information and belief, the cyberattack was expressly designed to gain access to and steal the private and confidential data, including (among other things) the PII of Plaintiffs and the Class Members.

67.     Upon information and belief, criminal hackers exfiltrated, stole, disseminated, and have misused Plaintiffs' and Class Members' PII because of the value in exploiting and stealing the identities of Plaintiffs and Class Members.

68.     As a result of the Data Breach, the risk of identity theft has materialized, and Plaintiffs and Class Members are at an imminent risk of identity theft.

---

[13]   *Id.*

## THE DATA BREACH WAS FORESEEABLE

69.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial industry and other industries holding significant amounts of PII preceding the date of the breach.

70.     In 2021 alone, there were over 200 data breach incidents.[14]  These approximately 200 data breach incidents have impacted nearly 15 million individuals.[15]

71.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), AFR knew or should have known that its systems would be targeted by cybercriminals.

72.     Indeed, cyberattacks against the financial industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminal were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII."   The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cyber crime."[16]

---

[14]   *See* Kim Delmonico, *Another (!) Orthopedic Practice Reports Data Breach*, Orthopedics This Week (May 24, 2021), https://ryortho.com/breaking/another-orthopedic-practice-reports-data-breach/.

[15]   *Id*.

[16]   Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

4888-8709-5336.v1

73.     Moreover, it is well known that the specific PII at issue in this case, including social security numbers and financial account information in particular, is a valuable commodity and a frequent target of hackers.

74.     As a sophisticated financial and lending entity that collects, utilizes, and stores particularly sensitive PII, AFR was at all times fully aware of the increasing risks of cyber-attacks targeting the PII it controlled, and its obligation to protect the PII of Plaintiffs and Class Members.

75.     AFR has acknowledged through conduct and statements that the misuse or inadvertent disclosure of PII can pose major privacy and financial risks to impacted individuals, and that under state law they may not disclose and must take reasonable steps to protect PII from improper release or disclosure.

**DEFENDANT FAILED TO PROTECT PLAINTIFFS' AND CLASS MEMBERS' PRIVATE INFORMATION**

76.     Despite the prevalence of public announcements of data breach and data security compromises, and despite Defendant's own acknowledgment of its duties to keep PII private and secure, AFR failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

77.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the Sensitive Information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII of over 200,000 individuals.

**A.     Defendant Failed to Properly Comply With Federal Trade Commission Data Security Standards**

78.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision

- 18 -

making.

79.     The FTC has brought well publicized enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.   This includes the FTC's enforcement action against Equifax following a massive data breach involving the personal and financial information of 147 million Americans.

80.     In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses. There, the FTC advised that businesses should protect the PII that they keep by following some minimum standards related to data security, including, among others:

(a)     Encrypting information stored on computer networks;

(b)     Identifying network vulnerabilities;

(c)     Implementing policies to update and correct any security problems;

(d)     Utilizing an intrusion detection systems;

(e)     Monitor all incoming traffic for suspicious activity indicating someone is attempting to hack the system;

(f)     Watching for large amounts of data being transmitted from the system;

(g)     Developing a response plan ready in the event of a breach;

(h)     Limiting employee and vendor access to sensitive data;

(i)     Requiting complex passwords to be used on networks;

(j)     Utilizing industry-tested methods for security;

(k)     Verifying that third-party service providers have implemented reasonable security measures;

(l)     Educating and training employees on data security practices;

(m)     Implementing multi-layer security including firewalls, anti-virus, and anti-malware software;

(n)     Implementing multi-factor authentication.

81.     In particular, the FTC further also advised that companies not maintain PII longer than is needed for authorization of a transaction:   "If you don't have a legitimate business need for sensitive personally identifying information, don't keep it."[17]

82.     Upon information and belief, AFR failed to implement or adequately implement at least one of these fundamental data security practices.

83.     AFR could have prevented this Data Breach by properly following FTC guidelines by adequately encrypting or otherwise protecting their equipment and computer files containing PII.

84.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**B.     Defendant Failed to Comply with Industry Standards**

85.     The financial industry also routinely incorporates these cybersecurity practices that are standard in AFR's industry. These minimum standards include but are not limited to:

(a)     Maintaining a secure firewall configuration;

(b)     Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

(c)     Monitoring for suspicious or irregular traffic to servers;

---

[17] FTC, *Protecting Personal Information:   A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

(d)　　Monitoring for suspicious credentials used to access servers;

(e)　　Monitoring for suspicious or irregular activity by known users;

(f)　　Monitoring for suspicious or unknown users;

(g)　　Monitoring for suspicious or irregular server requests;

(h)　　Monitoring for server requests for PII;

(i)　　Monitoring for server requests from VPNs; and

(j)　　Monitoring for server requests from Tor exit nodes.

86.　　Upon information and belief, AFR failed to comply with at least one of these minimal industry standards, thereby opening the door to and causing the Data Breach.

87.　　AFR could have prevented this Data Breach by properly following industry data security standards by adequately encrypting or otherwise protecting their equipment and computer files containing PII.

88.　　AFR could also have prevented the scale of the Data Breach simply by designing and implementing data retention practices to delete PII that is no longer needed for an ongoing business purpose.

89.　　AFR had the resources necessary, and reasonable data security alternatives were known and available to AFR that would have prevented the Data Breach, but AFR neglected to adequately evaluate its systems and invest in adequate security measures, despite its obligation to protect its systems and Plaintiffs' and Class Members' PII.

**C.　　Defendant Failed to Comply with Gramm-Leach-Bliley Act**

90.　　Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

91.　　The GLBA defines a financial institution as "any institution the business of which

- 21 -

is engaging in financial activities as described in Section 1843(k) of Title 12 [the Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

92.     Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant was subject to the requirements of the GLBA, 15 U.S.C. § 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA Statutes. The GLBA Privacy Rule became effective on July 1, 2001.  *See* 16 C.F.R. § 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule.  In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

93.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

94.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous."  16 C.F.R. §§ 313.4(a) and 313.5(a)(1); 12 C.F.R. §§ 1016.4 and 1016.5.  "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1).   These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4(a)(1) and 313.5(a)(1); 12 C.F.R. §§ 1016.4 and 1016.5.  They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and

- 22 -

confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9(a); 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

95.     Upon information and belief, Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing and/or sharing that PII on its network.

96.     Defendant failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on its inadequately secured network and would do so after the customer relationship ended.

97.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (a) designating one or more employees to coordinate the information security program; (b) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (c) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (d) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (e) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged

- 23 -

herein, Defendant violated the Safeguard Rule.

98.     Defendant failed to assess reasonably foreseeable risks to its networks, and to the security, confidentiality, and integrity of PII in its custody or control.

99.     Defendant failed to design and implement information safeguards to control the risks identified through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

100.    Defendant failed to adequately oversee service providers.

101.    Defendant failed to evaluate and adjust its information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.

## THE VALUE OF PII

102.    There is both a healthy black market and a legitimate market for the type of PII that was compromised in this action.  PII is such a valuable commodity to criminal networks that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

103.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18]

104.    According to the Dark Web Price Index for 2021, payment card details for an

---

[18]   Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

105.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name.  Then, when they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

106.    The Social Security Administration has further warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.  Such fraud may go undetected until debt collection calls commence months, or even years, later.  Stolen Social

---

[19]    Zachary Ignoffo, *Dark Web Price Index 2021*, PRIVACY AFFAIRS (Mar. 8, 2021), https://www.privacyaffairs.com/dark-web-price-index-2021/.

[20]    *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[21]    Social Security Administration, *Identity Theft and Your Social Security Number* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, apply for a job using a false identity, open bank accounts, and apply for other government documents such as driver's license and birth certificates.

107.    Each of these fraudulent activities is difficult to detect.  An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.  Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

108.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

109.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

110.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than

---

[22]    Brian Naylor, *Victims Of Social Security Number Theft Find It's Hard To Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

10x in price on the black market."[23]

111.     Driver's license numbers are also incredibly valuable.  "Hackers harvest license numbers because they're a very valuable piece of personal information.  A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[24]

112.     According to national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you.
>
> Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.[25]

113.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[26]   However, this is not the case.  As

---

[23]   Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[24] Lee Matthews, *Hackers Stole Customer's License Numbers from Geico In Months-Long Breach*, Forbes (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658.

[25]   Sue Poremba, *What Should I Do If My Driver's License Number is Stolen?* (Oct. 24, 2018) https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[26] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Custoemrs to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (Apr. 23, 2021),

- 27 -

cybersecurity experts point out:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.[27]

114.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent *The New York Times* article.[28]

115.    In addition, if a Class Member's Social Security number or driver's license number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

## PLAINTIFFS AND CLASS MEMBERS SUFFERED FORESEEABLE CONCRETE HARMS

116.    As a result of Defendant's ineffective and inadequate data security and retention measures, the Data Breach, and the foreseeable consequences of the PII ending up in the possession of criminals, the risk of identity theft is materialized and imminent.

117.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, reports of misuse of Class Member PII, and reports of dissemination on the Dark Web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/Dark Web for sale and purchase by criminals intending to

---

https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[27]  *Id.*

[28]  Ron Lieber, *How Identity Thieves Took My Wife for a Ride*, N.Y. Times (Apr. 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.

utilize the PII for identity theft crimes, such as opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; or file false unemployment claims.

118.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[29]  The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

119.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.  The fraudulent activity resulting from the Data Breach may not become evident for years.

120.    Indeed, "[t]he risk level is growing for anyone whose information is stolen in a data breach."[30]  Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[31]  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

121.    To date, Defendant has done little to adequately protect Plaintiffs and Class Members, or to compensate them for their injuries sustained in this data breach.    The

---

[29]  *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

[30]  Susan Ladika, *Study: Data Breaches Pose a Greater Risk*, Fox Business (Mar. 6, 2016), https://www.foxbusiness.com/features/study-data-breaches-pose-a-greater-risk.

[31]  THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH-IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, Al Pascal, JAVELIN STRATEGY & RESEARCH (June 2014),   https://www.it.northwestern.edu/bin/docs/The ConsumerDataInsecurityReport_byNCL.pdf.

- 30 -

complimentary fraud and identity monitoring service offered by Defendant through Experian IdentityWorks is wholly inadequate as the services are only offered for months and it places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this cybercrime.

122.   Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, in Defendant's words, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

123.   Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

124.   Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[32]

125.   Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity),

---

[32]   *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[33]

126.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.  When agreeing to pay Defendant or its clients for services, Plaintiffs and other reasonable consumers understood and expected that they were paying for services and data security, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected.

127.    As a result of Defendant's ineffective and inadequate data security and retention measures, the Data Breach, and the imminent risk of identity theft, Plaintiffs and Class Members have suffered numerous actual and concrete injuries, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e)  loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) deprivation of value of their PII; and (i) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Sensitive Information.

---

[33]    *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

4888-8709-5336.v1

## PLAINTIFFS' COMMON EXPERIENCES

*Plaintiff Micah's Experience*

128.    Prior to the Data Breach, AFR received Plaintiff Micah's PII during the course of applying for a mortgage.  Upon information and belief, Plaintiff Micah provided her PII to an AFR affiliate who provided the PII to AFR during the course of a mortgage application.   Upon information and belief, Plaintiff Micah also paid AFR a fee for its services.

129.    Plaintiff Micah is extremely careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. She stores any and all documents containing PII in a secure location and destroys any documents she receives in the mail that contain any PII or that may contain any information that could otherwise be used to compromise her identity and financial accounts.  Moreover, she diligently chooses unique usernames and passwords for her various online accounts.  In addition, she password-protects documents containing PII, and does not release her birthdate or other PII on social media sites, *etc.*, as a precautionary measure from identity fraud.  Further, she removes all trackers on electronic documents through MacAfee which shreds documents to totally remove them online.

130.    In March 2022, Plaintiff Micah received a Notice Letter from AFR, substantially similar to Exhibit 1, informing her that her full name and Social Security number were accessed by unauthorized third parties, and that her driver's license information was potentially accessed as well.  In the Notice Letter, AFR advised her to take certain steps to protect her PII and otherwise mitigate her damages. AFR never notified her that her date of birth was also compromised in the Data Breach.

131.    Plaintiff Micah has suffered several varieties of actual injuries as a result of the Data Breach.

132.    For example, she has received notifications from McAfee and Experian that her information was found on the dark web.  Additionally, Plaintiff Micah's husband experienced at least one unauthorized charge to a payment card linked to account with Plaintiff Micah after the Data Breach in June of 2022.  Plaintiff Micah believes this fraudulent charge is directly related to the Data Breach.

133.    In addition, Plaintiff Micah has also experienced a substantial increase in suspicious emails and "spam" telephone calls since the Data Breach which she believes were a result of the Data Breach. In fact, she had to cancel the service on her landline telephone service because she was getting an unmanageable amount of robocalls since the Data Breach.

134.    Moreover, as a result of the Data Breach and the directives that she received in the Notice Letter, Plaintiff Micah has already spent precious hours dealing with the consequences of the Data Breach (*e.g.*, self-monitoring her bank and credit accounts), as well as her time spent verifying the legitimacy of the Notice of Data Breach, communicating with her bank, researching and purchasing multiple forms of security protection services.  This time has been lost forever and cannot be recaptured.   Moreover, Plaintiff Micah spent this time at Defendant's direction.  Indeed, in the notice letter Plaintiff Micah received from Defendant, Defendant directed Plaintiff Micah to spend time mitigating her losses by "reviewing your account statements and credit reports for any unauthorized activity."  Given the short timeframe the attempted identity theft occurred in from the time of the Data Breach, it is reasonable to expect that Plaintiff Micah will continue to have to devote significantly more precious time and resources to the aftermath of the Data Breach for many years to come.  To date, she (and her husband, with whom she shares joint accounts) have already spent at least 100 hours dealing with the consequences of the Data Breach.

135.    On or about April 3, 2022, Plaintiff Micah renewed her McAfee anti-virus protection for $99.99 for one year as a result of the Data Breach.  In addition, she purchased a digital certificate service for her emails which is a security tool that attaches a digital certificate to her emails verifying that the email has come from her.  Plaintiff Micah has paid $60 for this service. Plaintiff Micah also has enabled enhanced protection on her Verizon accounts to protect intrusions into her cable, internet, and wireless devices.

136.    Plaintiff Micah has suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and deprivation in the value of her PII, a form of property that Defendant obtained from the Plaintiff; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

137.    Plaintiff Micah also loss the benefit of the bargain and price premium damages for the services he paid for.  Had she known that AFR would had inadequate data security practiced, she would not have entered into a business transaction, paid for the services, or provided his PII.

138.    Plaintiff Micah has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach since she received the Notice Letter.  Plaintiff Micah is especially concerned about the theft of her full name paired with her Social Security number and date of birth, which is readily obtainable from the driver's license which AFR notified that it may have been stolen in the Data Breach.

139.    Plaintiff Micah has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen PII, especially her Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

4888-8709-5336.v1

140.     Plaintiff Micah has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in AFR's possession, is protected and safeguarded from future breaches.

**_Plaintiff Stuart's Experience_**

141.     In or about early 2021, Plaintiff Stuart was a former AFR customer using the service on a previous home mortgage.  As a condition to receiving the services, AFR required Plaintiff Stuart to supply, and he provided, AFR with his PII, including, but not limited to, his name, address, date of birth, Social Security number, driver's license number, telephone number and email address, to participate in AFR's services. Upon information and belief, at the time of engaging the services, Plaintiff Stuart's PII was entered into AFR systems.  Upon information and belief, Plaintiff Stuart paid AFR a fee for its services.

142.     Plaintiff Stuart greatly values his privacy and Sensitive Information, especially when receiving loan and financial services.  Plaintiff Stuart has taken reasonable steps to maintain the confidentiality of his PII, and he has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

143.     Plaintiff Stuart expected and reasonably relied upon Defendant as part of its services to provide adequate data security to protect the PII that he entrusted to Defendant.  If Plaintiff Stuart had known that AFR would not adequately protect his PII, he would not have allowed AFR access to this Sensitive Information, and would not have engaged in business with Defendant.

144.     Upon information and belief, Plaintiff Stuart's PII was targeted, accessed, and downloaded and stolen by the third-party criminal actors in the Data Breach.

145.    As a result of the Data Breach, Plaintiff Stuart faces a substantial risk of imminent identity, financial, and health fraud and theft – both now and for years to come.  Plaintiff Stuart has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII, especially his Social Security number, being placed in the hands of unauthorized third-parties and possibly criminals.

146.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Stuart faces, Defendant provided Plaintiff Stuart a one-year subscription to a credit monitoring service.  However, Plaintiff Stuart has not sign up for the program, as he already has credit monitoring services from unrelated sources.

147.    Moreover, as a result of the Data Breach and the directives that he received in the Notice Letter, substantially similar to Exhibit 1, Plaintiff Stuart has already spent precious hours dealing with the consequences of the Data Breach (*e.g.*, self-monitoring his bank and credit accounts, dealing with an attempted HELOC fraud), as well as his time spent verifying the legitimacy of the Notice of Data Breach, communicating with his bank, exploring credit monitoring and identity theft insurance options, among other things. This time has been lost forever and cannot be recaptured.  Moreover, Plaintiff Stuart spent this time at Defendant's direction.  Indeed, in the notice letter Plaintiff Stuart received from Defendant, Defendant directed Plaintiff Stuart to spend time mitigating his losses by "reviewing your account statements and credit reports for any unauthorized activity."  Given the short time-frame the attempted identity theft occurred in from the time of the Data Breach, it is reasonable to expect that Plaintiff Stuart will continue to have to devote significantly more precious time and resources to the aftermath of the Data Breach for many years to come.

4888-8709-5336.v1

148.   As a result of the Data Breach, Plaintiff Stuart suffered actual injury and damages in paying money to AFR for identity services before the Data Breach; expenditures which he would not have made had AFR disclosed that it lacked data security practices adequate to safeguard PII.

149.   Plaintiff Stuart also suffered actual injury in the form of damages and deprivation in the value of his PII – a form of intangible property that he entrusted to AFR for the purpose of providing him services, which was compromised in and as a result of the Data Breach.

150.   Plaintiff Stuart also loss the benefit of the bargain and price premium damages for the services he paid for.  Had he known that AFR would had inadequate data security practiced, he would not have entered into a business transaction, paid for the services, or provided his PII.

151.   Furthermore, Plaintiff Stuart suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has increased concerns for the loss of his privacy, especially his Social Security number.

152.   Moving forward, Plaintiff Stuart has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in AFR's possession, is protected and safeguarded from future breaches.

***Plaintiff Styles' Experience***

153.   Plaintiff Styles was employed by AFR from August 2014 through August 2017 as a mortgage loan opener.  Prior to the Data Breach, AFR received Plaintiff Styles' PII in connection with her employment including her Social Security number and bank account information for the direct deposit of her paychecks from the Defendant.  Plaintiff Styles has not worked for AFR since August 2017, but AFR continued to possess her PII for almost five years after her employment ended.  Thus, AFR had no legitimate business need to keep her PII, much less keep it wholly unsecure.

154.    Plaintiff Styles is extremely careful about sharing her PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.  She does her best to store any and all documents containing sensitive PII in a secure location and destroy any documents she receives in the mail that contain PII or that may contain any information that could otherwise be used to compromise her identity and financial accounts.  She shreds all her mail that has her name and address on it.  She also diligently chooses unique usernames and passwords for her various online business accounts but does not have any online banking accounts for any of her personal financial accounts.  Plaintiff Styles very rarely makes any purchases online but when she has in the past, she did not set up an online account and does not store any credit card information online.  In addition, Plaintiff Styles' password-protect documents containing PII, and does not release her birthdate or other PII on social media sites, *etc.*, as a precautionary measure from identity fraud.

155.    In April 2022, Plaintiff Styles received the Notice Letter from AFR, substantially similar to Exhibit 1, informing her that her full name and Social Security number were accessed by unauthorized third parties, and that her driver's license information was potentially accessed as well.  In the Notice Letter, AFR advised Plaintiff Styles to take certain steps to protect her PII and otherwise mitigate her damages.  AFR never notified Plaintiff Styles that her date of birth was also compromised in the Data Breach.

156.    Plaintiff Styles has suffered several varieties of actual injuries as a result of the Data Breach.

157.    Specifically, as a direct and proximate result of the Data Breach, Plaintiff Styles has become a recent victim of identity theft and has had an unauthorized person make numerous attempts to withdraw money from her savings account at Santander Bank which is the same bank

and account number that she provided to AFR in connection with her employment.  The first incident occurred on May 9, 2022, when an unauthorized person representing themselves as Plaintiff Styles, presented a fictitious driver's license to a bank teller at a Santander bank branch in New York City attempting to withdraw $9300 from her savings account.  The bank teller would not allow the withdrawal and notified Plaintiff Styles.  This unauthorized person had set up an online banking account in Sharon Styles name.  Plaintiff Styles does not have an online banking account.  Later that day, the same incident happened at another Santander branch in New York City where an unauthorized person attempted to withdraw $8500 from her account.  On May 10, 2022, there was another unauthorized attempt to withdraw money from Sharon Styles' account in New York.  On May 13, 2022, Plaintiff Styles went to her local Santander branch to close out her compromised bank accounts and opened two new accounts.  On May 14, 2022, Plaintiff Styles received a phone call from a teller at a Santander branch in the Bronx informing her that someone representing themselves as Plaintiff Styles, presented a fictitious passport and Plaintiff Styles' new account information to withdraw money from Plaintiff Styles' bank account.  Luckily this unauthorized transaction was denied by the teller.  On May 16, 2022, Plaintiff Styles closed her bank accounts at Santander Bank and had to open new accounts in another bank in order to protect her financial accounts.

158.    Plaintiff Styles has also experienced numerous unauthorized charges on one of her credit cards following the Data Breach.  She had unauthorized charges on her credit card statement from February 23, 2022, from apple.com for $10.79 and from February 25, 2022, for a Microsoft yearly plan for $75.59.  Plaintiff Styles had to cancel her credit card and was without a credit card for approximately ten days until she received a new card.

- 40 -

159.   Plaintiff Styles has also experienced a substantial increase in suspicious emails and "spam" telephone calls since the Data Breach which she believes were a result of the Data Breach. She has blocked over 100 scam phone numbers on her mobile device since the Data Breach.

160.   Moreover, as a result of the Data Breach and the directives that she received in the Notice Letter, Plaintiff Styles has already spent precious hours dealing with the consequences of the Data Breach (*e.g.*, self-monitoring her bank and credit accounts), as well as her time spent verifying the legitimacy of the Notice of Data Breach, communicating with her bank and making numerous trips to her bank and a new bank to close bank accounts and open new bank accounts, putting a freeze on her credit with Equifax, Experian, and Trans Union and having to unlock these credit freezes to open up new bank accounts and then relock the freezes, exploring credit monitoring and identity theft insurance options, among other things.   This time has been lost forever and cannot be recaptured.   Moreover, Plaintiff Styles spent this time at Defendant's direction.   Indeed, in the Notice Letter Plaintiff Styles received from Defendant, Defendant directed Plaintiff Styles to spend time mitigating her losses by "reviewing your account statements and credit reports for any unauthorized activity."  Given the short timeframe the attempted identity theft occurred in from the time of the Data Breach, it is reasonable to expect that Plaintiff Styles will continue to have to devote significantly more precious time and resources to the aftermath of the Data Breach for many years to come.   To date, she has already spent at least 30 hours dealing with the consequences of the Data Breach.

161.   Plaintiff Styles has suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and deprivation in the value of her Sensitive Information, a form of property that Defendant obtained from Plaintiff Styles; (b)

violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

162.    Plaintiff Styles has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and she have suffered increased concerns for the loss of her privacy since Plaintiff Styles received the Notice Letter.  She is especially concerned about the theft of her full name paired with her Social Security number and date of birth, which is readily obtainable from the driver's license AFR notified Plaintiff Styles that may have been stolen in the Data Breach.

163.    Plaintiff Styles has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her stolen PII, especially her Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

164.    Plaintiff Styles has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in AFR's possession, is protected and safeguarded from future breaches.

***Plaintiff Oliva's Experience***

165.    Prior to the Data Breach, AFR received Dr. Oliva's PII after purchasing his mortgage from his prior lender.  Thereafter, AFR sold his mortgage to TIAA-CREF (effective December 1, 2018), but continued to possess Dr. Oliva's PII after the sale for more than three years later, and the Data Breach occurring more than three years from that mortgage sale.  Thus, AFR had no legitimate business need to keep Dr. Oliva's PII, much less keep it wholly unsecure.

166.    Dr. Oliva is extremely careful about sharing his PII and has made his best efforts to not knowingly transmitted unencrypted PII over the internet or any other unsecured source.  He

also does his best to store any and all documents containing sensitive PII in a secure location, and destroys documents he receives in the mail that contain PII or that may contain information that could otherwise be used to compromise his identity and financial accounts, or otherwise secures in a locked filing cabinet or personal safe for documents that need to be retained.  He also diligently chooses unique usernames and passwords for his various online accounts.  In addition, Dr. Oliva password-protects documents containing PII, and does not release his birthdate on social media sites, *etc.*, as a precautionary measure from identity fraud.

167.    To prevent PII compromise and fraudulent activity against his bank and other accounts, Dr. Oliva has intentionally requested from his bank not to have a debit card.  Instead, Dr. Oliva only uses third-party credit cards for all purchases as much as possible, including separate credit cards for consumer purchases and utilities, to protect his bank and other accounts. These cards are then paid in full each month.  In addition, Dr. Oliva does not have PIN numbers set-up on his credit card as an extra layer of protection to prevent unauthorized cash advance withdrawals.

168.    In March 2022, Dr. Oliva received the Notice Letter from AFR, substantially similar to Exhibit 1, informing him that his full name and Social Security number were accessed by unauthorized third parties, and that his driver's license information was potentially accessed as well.  In the Notice Letter, AFR advised Dr. Oliva to take certain steps to protect his PII and otherwise mitigate his damages. AFR never notified Dr. Oliva that his date of birth was also compromised in the Data Breach.

169.    Dr. Oliva has suffered several varieties of actual injuries as a result of the Data Breach.

170.    Specifically, as a direct and proximate result of the Data Breach, Dr. Oliva has become a recent victim of identity theft and has had an unauthorized person attempt to fraudulently

obtain a home equity line of credit in his name.  As a result, Dr. Oliva's credit score dropped, which negatively impacts his ability to receive financing as well as negatively impacts potential interest rates for consumer items.

171.    Moreover, as a result of the Data Breach and the directives that he received in the Notice Letter, Dr. Oliva has already spent precious hours dealing with the consequences of the Data Breach (*e.g.*, self-monitoring his bank and credit accounts, dealing with an attempted HELOC fraud), as well as his time spent verifying the legitimacy of the Notice of Data Breach, communicating with his bank, exploring credit monitoring and identity theft insurance options, among other things. This time has been lost forever and cannot be recaptured. Moreover, Plaintiff spent this time at Defendant's direction. Indeed, in the Notice Letter Dr. Oliva received from Defendant, Defendant directed Dr. Oliva to spend time mitigating his losses by "reviewing your account statements and credit reports for any unauthorized activity."  Given the short time-frame the attempted identity theft occurred in from the time of the Data Breach, it is reasonable to expect that Dr. Oliva will continue to have to devote significantly more precious time and resources to the aftermath of the Data Breach for many years to come.

172.    Furthermore, Dr. Oliva has suffered an injury in the form of deprivation in the value of his PII, which is a form of property, insofar as its value has been diminished by the Data Breach.

173.    Dr. Oliva has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and he has suffered increased concerns for the loss of his privacy since he received the Notice Letter.  He is especially concerned about the theft of his full name paired with his Social Security number and date of birth, which is readily obtainable from the driver's license AFR notified him may have been stolen in the Data Breach.

174.    Dr. Oliva has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII, especially his Social Security number, being placed in the hands of unauthorized third-parties and possibly criminals.

175.    Dr. Oliva has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in AFR's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

176.    Plaintiffs bring this Complaint on behalf of themselves and the Class Members pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4).

177.    Plaintiffs seek to remedy those harms described herein on behalf of themselves and all similarly situated persons whose PII was accessed unlawfully during the Data Breach.

178.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

**All persons residing in the United States whose PII was compromised in the Data Breach (the "Nationwide Class" or the "Class").**

179.    The Nationwide Class asserts claims under New Jersey law against AFR for: (1) negligence, (2) negligence *per se*, (3) breach of confidence, (4) intrusion upon seclusion, (5) breach of implied contract, (6) unjust enrichment, (7) violations of New Jersey state consumer protection statutes; and (8) Declaratory Judgment.

180.    Alternatively, Plaintiffs seek certification of Florida, Maryland, Illinois, and Pennsylvania law claims on behalf of alternative Florida, Maryland, Illinois, and Pennsylvania Classes, defined as follows:

- 45 -

> **All natural persons residing in [Florida, Maryland, Illinois, or Pennsylvania] whose PII was compromised in the Data Breach (the "[Florida, Maryland, Illinois, or Pennsylvania] Class").**

181. The alternative Florida, Maryland, Illinois, and Pennsylvania Classes assert claims under their respective state laws against AFR for violations of state consumer protection statutes and/or state common law.

182. Excluded from the Nationwide Class and the alternative Florida, Maryland, Illinois, and Pennsylvania Classes are AFR, any entity in which either AFR has a controlling interest, and either AFR's officers, directors, legal representatives, successors, subsidiaries, and agents; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out;  and any and all federal, state or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions.  Also excluded from the Nationwide Class and the alternative Florida, Maryland, Illinois, and Pennsylvania Classes are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff.

183. <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Nationwide Class consists of over 200,000 individuals whose sensitive data was compromised in the Data Breach.  The alternative Florida, Maryland, Illinois, and Pennsylvania Classes more than likely contains thousands of Class Members throughout each of the states.

184. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3):  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation:

4888-8709-5336.v1

(a)    Whether AFR breached a duty to Class Members to safeguard their PII;

(b)    Whether AFR expressly or impliedly promised to safeguard the PII of Plaintiffs and Class Members.

(c)    Whether AFR unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

(d)    Whether AFR failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(e)    Whether AFR's data security systems prior to, during, and after the Data Breach complied with the applicable FTC data security laws and regulations;

(f)    Whether AFR's data security systems prior to and during the Data Breach were consistent with industry standards, as applicable;

(g)    Whether unauthorized third parties accessed or obtained Class Members PII in the Data Breach;

(h)    Whether the AFR knew or should have known that its data security systems and monitoring processes were deficient;

(i)    Whether the Plaintiffs and Class Members suffered legally cognizable injuries as a result of the AFR's misconduct;

(j)    Whether AFR's conduct was negligent;

(k)    Whether AFR breached an expressed of implied contractual obligations;

(l)    Whether AFR violated New Jersey state consumer protections statutes;

(m)    Whether AFR violated Florida, Maryland, or Illinois state consumer protections statutes;

(n)    Whether AFR was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

(o)    Whether AFR failed to provide notice of the Data Breach in a timely manner;

(p)    Whether AFR adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur; and

(q)    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, and/or injunctive relief.

4888-8709-5336.v1

185.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3):  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

186.   <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4):  Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class.  Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs' counsel are competent and experienced in litigating class actions and data breach cases.

187.   <u>Predominance</u>, Fed. R. Civ. P. 23(b)(3):   AFR has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all of Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way.  The common issues arising from AFR's conduct affecting Class Members set out above predominate over any individualized issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

188.   <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3):   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.  Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.  The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for AFR.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

189.   <u>Manageability</u>, Fed. R. Civ. P. 23(b)(3):  The litigation of the claims brought herein is manageable. AFR's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.  Adequate notice can be given to Class Members directly using information maintained in AFR's records.

190.   <u>Conduct Generally Applicable to the Class</u>, Fed. R. Civ. P. 23(b)(2):  Further, AFR has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.  Unless a class-wide injunction is issued, AFR may continue in its failure to properly secure the PII of Class Members, AFR may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and AFR may continue to act unlawfully as set forth in this Complaint.

191.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  The particular issues include, nit are not limited to:

(a)   Whether AFR owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

(b)   Whether AFR breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

(c)   Whether AFR failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

(d)   Whether an implied contract existed between AFR on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

(e)   Whether AFR breached the implied contract;

(f)   Whether AFR adequately, and accurately informed Plaintiffs and Class

- 50 -

Members that their PII had been compromised;

(g)     Whether AFR failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

(h)     Whether AFR engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and

(i)     Whether Class Members are entitled to actual damages, statutory damages, nominal damages, injunctive relief, and/or punitive damages as a result of AFR's wrongful conduct.

## CLAIMS ON BEHALF OF THE NATIONWIDE CLASS AND ALTERNATIVE FLORIDA, MARYLAND, ILLINOIS AND PENNSYLVANIA CLASSES

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

192.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

193.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes.

194.    AFR owed several common law duties to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII within its control from being accessed, compromised, exfiltrated, and stolen by criminal third parties in foreseeable cyber-crimes.

195.    First, a common law duty arose by the foreseeability of the cyber-crimes.  Due to the ongoing threat and highly publicized cyber-attacks businesses like AFR that acquire and store PII, AFR was on notice of the substantial and foreseeable risk of a cyber-attack on its systems, and that Plaintiffs and Class Members would be harmed if AFR did not protect Plaintiffs' and Class Members' information from threat actors.

- 51 -

196.     AFR knew or should have known that its systems were vulnerable to unauthorized access and exfiltration by criminal third parties.   AFR knew, or should have known, of the importance of safeguarding Plaintiffs' and Class Members' PII – including Social Security numbers, driver's license numbers, and financial account information.   AFR further knew or should have known and of the foreseeable consequences and harm to Plaintiffs and Class Members, if AFR's data security system and network was breached – including, specifically, the risk of identity theft and related costs imposed on Plaintiffs and Class Members as a result of a data breach.   AFR knew or should have known about these risk and dangers to Plaintiffs and Class Members and taken steps to strengthen its data, IT, and email handling systems accordingly.

197.     Second, by obtaining, collecting, using, retaining, and deriving benefits from Plaintiffs' and the Class Members' PII, Defendant assumed the legal duty to protect Plaintiffs' and Class Members' PII from foreseeable cyber-crimes.

198.     Third, AFR's duty to use reasonable data security measures arose as a result of the special relationship that existed between AFR and the Plaintiffs and Class Members.   The special relationship arose because AFR received Plaintiffs' and Class Members' confidential data as part of the financial process for obtaining residential mortgages.   AFR was in the sole position to ensure that it had sufficient safeguards to protect against the harm to Plaintiffs and Class Members that would result from a data breach.

199.     Finally, AFR's duties arose by statute under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal and confidential information.   Various FTC publications and data security breach orders further form the basis of AFR's duty.

200.    AFR breached its respective common law and statutory duties by failing to provide data security consistent with industry standards to ensure that its systems and networks adequately protected the PII it had been entrusted against foreseeable cyber-crimes.   AFR did not use reasonable security procedures and practices appropriate for the nature of the sensitive information it was maintaining, causing Plaintiffs' and Class Members' PII to be exposed.   As a result, AFR increased the risk to Plaintiffs and Class Members that their PII would be compromised and stolen in a cyber-crime.

201.    Plaintiffs' and Class Members' PII would not have been compromised in the Data Breach but for AFR's wrongful and negligent breach of its duties.

202.    Neither Plaintiffs nor, upon information and belief, the other Class Members contributed to the Data Breach or subsequent misuse of their PII as described in this Complaint.

203.    AFR breached its obligations to Plaintiffs and the Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.   Upon information and belief, AFR could have prevented this Data Breach by encrypting, or adequately encrypting, or otherwise protecting their equipment and computer files containing Plaintiffs' and Class Members' PII.

204.    Upon information and belief, AFR's negligent conduct also includes, but is not limited to, one or more of the following acts and omissions:

(a)    Failing to maintain and update an adequate data security system to reduce the risk of data breaches;

(b)    Failing to adequately train employees to protect consumers' PII;

(c)    Failing to adequately monitor, evaluate, and ensure the security of its network and systems;

(d)    Failing to properly monitor its own data security systems for existing intrusions;

- 53 -

(e)     Failing to comply with the minimum FTC guidelines for cybersecurity, in violation of the FTCA;

(f)     Failing to adhere to industry standards for cybersecurity;

(g)     Failing to encrypt or adequately encrypt the PII;

(h)     Failing to implement reasonable data retention policies;

(i)     Failing to timely and adequately disclose that Plaintiffs' and Class Members' PII had been improperly acquired or accessed; and

(j)     Was otherwise negligent.

205.    Furthermore, AFR was plainly aware that it should destroy any PII that it no longer needed to service a mortgage (*e.g.*, where AFR sold its mortgage-servicing on a particular mortgage to another company), or for the purposes of employment, or at least should have ensured extra precautions to secure such PII since, under such circumstances, there was effectively no longer a "legitimate business 'need to know'" for accessing it.

206.    As a direct and proximate result of Defendant's negligent acts and/or omissions, Plaintiffs' and Class Members' PII was compromised, and they are all at a high risk of identity theft and financial fraud for many years to come.  Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) invasion of privacy; (b) financial costs incurred mitigating the risk of future identity theft; (c) loss of time and loss of productivity incurred mitigating the risk of future identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of PII; and (g) the continued risk to their Sensitive Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Sensitive Information.

207.    Plaintiffs seek to remedy these harms, and to prevent the future occurrence of an additional data breach, on behalf of themselves and all similarly situated persons whose Sensitive Information were compromised as a result of the Data Breach.  Plaintiffs seek compensatory damages for invasion of privacy, loss of time, opportunity costs, out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems and protocols, future annual audits, and adequate credit monitoring services funded by the Defendant.

208.    Accordingly, Plaintiffs, individually and on behalf of all those similarly situated, seek an order declaring that AFR's conduct constitutes negligence and awarding damages in an amount to be determined at trial.

## COUNT II
## NEGLIGENCE *PER SE*
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

209.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

210.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes.

211.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as AFR, of failing to use reasonable measures to protect PII.  15 U.S.C. §45(a)(1).

212.    The FTC publications and orders described above also form part of the basis of AFR's duty in this regard.

213.    AFR violated the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards.  AFR's conduct was particularly unreasonable given the nature and amount of PII it obtained, stored, and disseminated, and the foreseeable

consequences of a data breach involving companies as large as AFR, including, specifically, the immense damages that would result to Plaintiffs and Class Members.

214.    AFR's violations of the FTCA, as interpreted by the FTC to include a duty to employ adequate and reasonable data security measures, constitute negligence *per se*.

215.    Plaintiffs and Class Members are within the class of persons that the FTCA was intended to protect.

216.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

217.    Similarly, rhe Safeguards Rule, which implements Section 501(b) of the GLBA,15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

218.    AFR violated the Safeguards Rule by failing to assess reasonably foreseeable risks to the security, confidentiality, and integrity of PII in its custody or control; failing to design and implement information safeguards to control the risks identified through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures; failing to adequately oversee service providers; and failing to evaluate and adjust its information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.

219.    AFR's violations of the GLBA constitute negligence *per se*.

4888-8709-5336.v1

220.    Plaintiffs and Class Members are within the class of persons that the GLBA was intended to protect.

221.    The harm that occurred as a result of the Data Breach is the type of harm the GLBA was intended to guard against.

222.    As a direct and proximate result of AFR's negligence *per se* under the FTCA and GLBA, Plaintiffs and the Class have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

**COUNT III**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

223.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

224.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes.

225.    AFR and Plaintiffs and Class Members maintained a confidential relationship, whereby AFR undertook a duty not to disclose the PII provided to AFR to unauthorized third parties.  Such PII was confidential and novel, highly personal and sensitive, and not generally known.

226.    AFR knew Plaintiffs' and Class Members' PII was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreed to protect the confidentiality and security of the PII they collected, stored, and maintained.

227.    As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' PII in violation of this understanding.  The unauthorized disclosure occurred

- 57 -

because AFR failed to implement and maintain reasonable safeguards to protect the PII in its possession and failed to comply with industry-standard data security practices.

228.    Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

229.    As a direct and proximate result of AFR's breach of confidence, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein.  Plaintiffs and Class Members alternatively seek an award of nominal damages.

**COUNT IV**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

230.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

231.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes.

232.    AFR intentionally intruded into Plaintiffs' and Class Members' seclusion by failing to keep their PII secure.

233.    By failing to keep Plaintiffs' and Class Members' PII secure, and allowing for access and disclosing of the PII to unauthorized parties for unauthorized use, AFR unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, *inter alia*:

    (a)    intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    (b)    invading their privacy by improperly using their PII properly obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

    (c)    failing to adequately secure their PII from disclosure to unauthorized persons; and

- 58 -

(d)      enabling the disclosure of their PII without consent.

234.    The PII that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included private financial, employment, and personal information.

235.    As a direct and proximate result of AFR's intrusion upon seclusion, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members alternatively seek an award of nominal damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

236.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

237.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class in the alternative to all other Counts alleged herein.

238.    For years and continuing to today, AFR's business model has depended upon it being entrusted with customers' PII.  Trust and confidence are critical and central to the services provided by AFR in the residential financing industry.   Unbeknownst to Plaintiffs and absent Class Members, however, AFR did not secure, safeguard, or protect its customers' and employees' data and employed deficient security procedures and protocols to prevent unauthorized access to customers' PII. AFR's deficiencies described herein were contrary to their security messaging.

239.    Plaintiffs and absent Class Members received services from AFR, and AFR was provided with, and allowed to collect and store, their PII on the mistaken belief that AFR complied with their duties to safeguard and protect its customers' and employees' PII.  Upon information and belief, putting their short-term profit ahead of safeguarding PII, and unbeknownst to Plaintiffs and absent Class Members, AFR knowingly sacrificed data security in an attempt to save money.

- 59 -

240.    Upon information and belief, AFR knew that the manner in which they maintained and transmitted customer PII violated industry standards and their fundamental duties to Plaintiffs and absent Class Members by neglecting well-accepted security measures to ensure confidential information was not accessible to unauthorized access.   AFR had knowledge of methods for designing safeguards against unauthorized access and eliminating the threat of exploit, but it did not use such methods.

241.    AFR had within its exclusive knowledge, and never disclosed, that they had failed to safeguard and protect Plaintiffs' and absent Class Members' PII.   This information was not available to Plaintiffs, absent Class Members, or the public at large.

242.    AFR also knew that Plaintiffs and absent Class Members expected security against known risks and that they were required to adhere to state and federal standards for the protection of confidential personally identifying, financial, and other personal information.

243.    Plaintiffs and absent Class Members did not expect that AFR would knowingly insecurely maintain and hold their PII when that data was no longer needed to facilitate a business transaction or other legitimate business reason.   Likewise, Plaintiffs and absent Class Members did not know or expect that AFR would employ substantially deficient data security systems and fail to undertake any required monitoring or supervision of the entrusted PII.

244.    Had Plaintiffs and absent Class Members known about AFR's efforts to deficiencies and efforts to hide their ineffective and substandard data security systems, Plaintiffs and absent Class Members not have entered into business dealings with AFR.

245.    By withholding the facts concerning the defective security and protection of customer PII, AFR put their own interests ahead of the very customers who placed their trust and

confidence in AFR, and benefitted themselves to the detriment of Plaintiffs and absent Class Members.

246.   As a result of its conduct as alleged herein, AFR sold more services than it otherwise would have, and was able to charge Plaintiffs and Class Members more for AFR's mortgage services than it otherwise could have.  AFR was unjustly enriched by charging for and collecting for those services that it would not have obtained to the detriment of Plaintiffs and absent Class Members.

247.   It would be inequitable, unfair, and unjust for AFR to retain these wrongfully obtained fees and benefits.  AFR's retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

248.   AFR's unfair and deceptive conduct to not disclose those defects have, among other things, caused Plaintiffs and Class Members to enter into a business arrangement that was deceptive and dangerous to their identities.

249.   As a result, Plaintiffs paid for services that they would not have paid for had Defendant disclosed the inadequacy of its data security practices.

250.   Plaintiffs and each Member of the proposed Class are each entitled to restitution and non-restitutionary disgorgement in the amount by which AFR were unjustly enriched, to be determined at trial.

### COUNT VI
### BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

251.   Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

- 61 -

252.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes.

253.    When Plaintiffs and Class Members paid money and provided their PII to AFR in exchange for goods or services, they entered into implied contracts with AFR pursuant to which AFR agreed to safeguard and protect such information and to timely and accurately notify them if their data had been breached and compromised.

254.    AFR solicited and invited prospective customers to provide their PII as part of its regular business practices.  As a condition of receiving services or being eligible for employment, Defendant required Plaintiffs and Class Members to provide their PII, including names, Social Security numbers, driver's license numbers, addresses, dates of birth, email addresses, financial account numbers, and payment card numbers.

255.    Pursuant to FTC guidelines and standard practice in the financial industry, AFR was obligated to take reasonable steps to maintain the security of Plaintiffs' and Class Members' PII.  As a result, by requesting that Plaintiffs and Class Members provide their PII as part of their doing business with AFR, AFR implicitly promised to adhere to these industry standards.

256.    Plaintiffs and Class Members each accepted AFR's offers and provided their PII to AFR.  In entering into such implied contracts, Plaintiffs and the Class reasonably believed that AFR's data security practices and policies were reasonable and consistent with industry standards, and that AFR would use part of the fees received from Plaintiffs and the Class to pay for adequate and reasonable data security practices to safeguard the PII.

257.    Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.  Defendant accepted the PII, and there was a meeting of the minds that Defendant would secure, protect, and keep the PII confidential.

- 62 -

258.    Plaintiffs fully performed their obligations under the implied contracts with Defendant.

259.    Plaintiffs would not have entered into transactions with AFR if Plaintiffs had known that AFR would not protect their PII.

260.    Plaintiffs and the Class would not have provided and entrusted their PII to AFR in the absence of the implied contract between them and AFR to keep the information secure.

261.    Plaintiffs and the Class fully performed their obligations under the implied contracts with AFR.

262.    AFR breached its implied contracts with Plaintiffs and the Class by failing to safeguard and protect their PII and by failing to provide timely and accurate notice that their PII was compromised as a result of the Data Breach.

263.    As a direct and proximate result of AFR's breaches of their implied contracts, Plaintiffs and the Class sustained actual losses and damages as described herein.

**COUNT VII**
**NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. § 56:8-2**
**(On Behalf of Plaintiffs and the Nationwide Class)**

264.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

265.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

266.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with

- 63 -

the subsequent performance of such person as aforesaid, whether or not any person has in fact been

misled, deceived or damaged thereby." N.J.S.A. § 56:8-2.

267.    By the acts and conduct alleged herein, AFR committed unfair or deceptive acts

and practices by:

> (a)    failing to maintain adequate computer systems and data security practices to safeguard PII;
>
> (b)    failing to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft;
>
> (c)    continuing to gather and store PII, and other personal information after AFR knew or should have known of the security vulnerabilities of its computer systems that were exploited in the data breach;
>
> (d)    continuing to gather and store PII, and other personal information after AFR knew or should have known of the Data Breach and before AFR allegedly remediated the data security incident;
>
> (e)    continuing to store and maintain the PII of former customers when AFR had no legitimate business need to do so; and
>
> (f)    delaying in notifying the Plaintiffs and Class Members of the Data Breach, and the full scope of the Data Breach.

268.    These unfair acts and practices violated duties imposed by laws, including, but not

limited to the FTCA, the Gramm-Leach-Bliley Act, the Florida Deceptive and Unfair Trade

Practices Act, and the New Jersey CFA.

269.    AFR's delay in notifying the victims of the Data Breach also violates provisions of

the New Jersey Consumer Security Breach Disclosure Act, which required AFR, once it knew or

had reason to know of a data security breach involving personal information, to provide prompt

and direct notice of such breach to any affected, indicating another deceptive act and practice.

270.    The foregoing deceptive acts and practices emanated from New Jersey and were

directed at consumers/purchasers in New Jersey and in each state where Defendant did business.

271.    AFR, Plaintiffs, and Class Members are "persons" within the meaning of N.J.S.A.

- 64 -

§ 56:8-1(d).

272.    AFR engaged in "sales" of "merchandise" within the meaning of N.J.S.A. § 56:8-1(c), (d).

273.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the character of the financial services provided, specifically as to the safety and security of PII, and other personal and private information, to induce consumers to purchase the same.

274.    AFR's unconscionable commercial practices, false promises, misrepresentations, and omissions set forth in this Class Action Complaint are material in that they relate to matters which reasonable persons, including Plaintiffs and Members of the Class, would attach importance to in making their purchasing decisions or conducting themselves regarding the purchase of services from AFR.

275.    Plaintiffs and Class Members are consumers who made payments to Defendant for the furnishing of financial services that were primarily for personal, family, or household purposes.

276.    AFR engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the furnishing of services to consumers, including Plaintiffs and Class Members.  AFR's acts, practices, and omissions were done in the course of AFR's business of marketing, offering to sell, and furnishing services from the State of New Jersey. As a direct and proximate result of AFR's multiple, separate violations of N.J.S.A. § 56:8-2, Plaintiffs and the Class Members suffered damages including, but not limited to: (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity

- 65 -

addressing and attempting to mitigate the actual and future consequences of the data breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII, which remains in AFR's possession and is subject to further unauthorized disclosures so long as AFR fails to undertake appropriate and adequate measures to protect the PII in its continued possession; (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (g) the diminished value of AFR's services they received.

277.    Also as a direct result of AFR's violation of the New Jersey CFA, Plaintiffs and the Class are entitled to damages as well as injunctive relief, including, but not limited to, ordering AFR to: (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) immediately provide adequate credit monitoring to all Class Members.  Plaintiffs and Class Members were injured because: (a) they would not have paid for Defendant's services had they known the true nature and character of AFR's data security practices; (b) would not have entrusted their PII to AFR in the absence of promises that Defendant would keep their information reasonably secure, and (c) would not have entrusted their PII to Defendant in the absence of the promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

278.    As a result, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial.

279.    On behalf of themselves and other members of the Class, Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining AFR's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J.S.A. § 56:8-19, and any other just and appropriate relief.

4888-8709-5336.v1

## COUNT VIII
## <u>DECLARATORY JUDGMENT</u>
**(On behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes)**

280.     Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

281.     This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

282.     Plaintiffs and Class Members entered into an implied contract that required Defendant to provide adequate security for the PII it collected from Plaintiffs and Class Members.

283.     Defendant owes a duty of care to Plaintiffs and Class Members requiring them to adequately secure PII.

284.     Defendant still possesses PII regarding Plaintiffs and Class Members

285.     Since the Data Breach, Defendant has announced few if any specific and significant changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent further attacks.

286.     Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and Class Members.  In fact, now that Defendant's insufficient data security is known to hackers, the PII in Defendant's possession is even more vulnerable to cyberattack.

287.     Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members.  Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

4888-8709-5336.v1

288.     There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

289.     Plaintiffs, therefore, seek a declaration: (a) that Defendant's existing security measures do not comply with their contractual obligations and duties of care to provide adequate security, and (b) that to comply with their contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

(a)     Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

(b)     Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

(c)     Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

(d)     Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

(e)     Ordering that Defendant not transmit PII via unencrypted email;

(f)     Ordering that Defendant not store PII in email accounts;

(g)     Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

(h)     Ordering that Defendant conduct regular computer system scanning and security checks;

(i)     Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

- 69 -

(j)    Ordering Defendant to meaningfully educate their current, former, and prospective customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

**CLAIM ON BEHALF OF THE ALTERNATIVE FLORIDA CLASS**

**COUNT IX**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.201, _et seq._**
**(On Behalf of Plaintiffs and the Alternative Florida Class)**

290.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

291.    Plaintiff Dr. Oliva brings this claim on behalf of himself and the alternative Florida Class.

292.    This cause of action is brought pursuant the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which, pursuant to Fla. Stat. § 501.202, requires such claims be "construed liberally" by the courts "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

293.    AFR's offers, provisions, and sales or services at issue in this case are "consumer transaction[s]" within the scope of the FDUTPA.  *See* Fla. Stat. §§ 501.201-501.213.

294.    Dr. Oliva and Class Members are "individual[s]," and are "consumer[s]" as defined by the FDUTPA.  *See* Fla. Stat. § 501.203(7).

295.    AFR provided residential mortgage services on Dr. Olivia's and Class Members' behalf.

296.    AFR offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the

- 70 -

FDUTPA.  *See* Fla. Stat. § 501.203.

297.    Dr. Olivia and Class Members paid for or otherwise availed themselves and received services from AFR, primarily for personal, family, or household purposes.

298.    AFR engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of residential mortgage services to or for Dr. Oliva and Class Members.

299.    AFR's acts, practices, and omissions were done in the course of AFR's business of offering, providing, and selling residential mortgage services throughout Florida and the United States.

300.    The unfair, unconscionable, and unlawful acts and practices of AFR alleged herein, and in particular the decisions regarding data security, emanated and arose – with respect to Florida Class Members, within the state of Florida, within the scope of the FDUTPA.

301.    AFR, operating in Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. §501.204(1), including but not limited to the following:

     (a)    failing to implement and maintain reasonable and adequate computer systems and data security practices to safeguard customer PII;

     (b)    omitting, suppressing, and concealing the material fact that their computer systems and data security practices were inadequate to safeguard customer PII from unauthorized access and theft;

     (c)    failing to protect the privacy and confidentiality of Plaintiffs' and Class Members' PII;

     (d)    continuing to accept and store customer PII after AFR knew or should have known of the security vulnerabilities that were exploited in the Data Breach;

     (e)    continuing to accept and store customer PII after AFR knew or should have known of the Data Breach and before it allegedly remediated the Data Breach; and

- 71 -

(f)     continuing to store and maintain the PII of former customers when AFR had no legitimate business need to do so.

302.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to the FTC Act, 15 U.S.C. § 41, *et seq.*, and the FDUTPA, Fla. Stat. § 501.171(2).

303.    AFR knew or should have known that its computer system and data security practices were inadequate to safeguard Dr. Olivia's and Class Members' PII and that the risk of a data breach or theft was high.

304.    Dr. Olivia has standing to pursue this claim because as a direct and proximate result of AFR's violations of the FDUTPA, Dr. Olivia and Class Members have been "aggrieved" by a violation of the FDUTPA and bring this action to obtain a declaratory judgment that AFR's acts or practices violate the FDUTPA. *See* Fla. Stat. § 501.211(a).

305.    Dr. Olivia also has standing to pursue this claim because, as a direct result of AFR's knowing violation of the FDUTPA, Dr. Oliva and the Class are at a substantial and imminent risk of identity theft.  AFR still possesses Dr. Olivia's and the Class Members' PII, and that PII has been both accessed and misused by unauthorized third parties, which is evidence of a substantial and imminent risk of identity theft for Dr. Olivia and all Class Members.

306.    Dr. Olivia and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of identity theft, including, but not limited to:

(a)     ordering that AFR engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

(b)     ordering that AFR engage third-party security auditors and internal personnel to run automated security monitoring;

- 72 -

(c)     ordering that AFR audit, test, and train security personnel regarding any new or modified procedures;

(d)     ordering that AFR segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

(e)     ordering that AFR purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner;

(f)     ordering that AFR conduct regular database scans and security checks;

(g)     ordering that AFR routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

(h)     ordering AFR to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps present and former customers should take to protect themselves.

307.    Dr. Olivia also has standing to pursue this claim because as a direct and proximate result of AFR's violations of FDUTPA, he suffered actual damages in the form of actual identity theft and reduction of his credit score, and lost time devoted to dealing with these.

308.    Dr. Olivia brings this action on behalf of himself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Dr. Olivia, Class Members, and the public from AFR's unfair methods of competition and unfair, unconscionable, and unlawful practices. AFR's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

309.    The above unfair, unconscionable, and unlawful practices and acts by AFR were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Dr. Olivia and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

- 73 -

310.    AFR's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices and described herein were negligent, knowing and willful, and/or wanton and reckless.

311.    Dr. Olivia and Class Members seek relief under the FDUTPA, Fla. Stat. §§ 501.201, *et seq.*, including, but not limited to, damages, restitution, a declaratory judgment that AFR's actions and/or practices violate the FDUTPA; injunctive relief enjoining AFR, their employees, parents, subsidiaries, affiliates, executives, and agents from violating the FDUTPA; ordering that AFR engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on its systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors; ordering that AFR engage third-party security auditors and internal personnel to run automated security monitoring; ordering that AFR audit, test, and train security personnel regarding any new or modified procedures; ordering that AFR segment customer data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system; ordering that AFR purge, delete, and destroy customer PII not necessary for its provisions of services in a reasonably secure manner; ordering that AFR conduct regular database scans and security checks; ordering that AFR routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; ordering AFR to meaningfully educate customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps current and former customers should take to protect themselves; attorneys' fees and costs; and any other just and proper relief.

**CLAIM ON BEHALF OF THE ALTERNATIVE MARYLAND CLASS**

**COUNT X**
**MARYLAND CONSUMER PROTECTION ACT, Md. Comm. Code § 13-301, *et seq.***
**(On Behalf of Plaintiffs and the Alternative Maryland Class)**

312.    Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

313.    Plaintiff Micah brings this claim on behalf of herself and the alternative Maryland Class.

314.    Plaintiff Micah and the Maryland Class are "consumers" under Md. Comm. Code § 13-101(c).

315.    AFR is a "person" under Md. Comm. Code § 13-101(h) and offerd, advertised, or selld "consumer services" as defined in Md. Comm. Code § 13-101(d).

316.    AFR engaged in the acts and omissions alleged herein in the state of Maryland with respect to Plaintiff Micah and the Maryland Class.

317.    AFR engaged in unfair and deceptive acts and practices in violation of the Maryland Consumer Protection Act, including failing to state a material fact where the failure deceives or tends to deceive, advertising or offering consumer goods or services without the intent to sell or provide them as advertised, and misrepresentation, concealment, suppression, or omission of a material fact with the intent that a consumer rely on the same in connection with the sale of consumer services or the subsequent performance with respect to an agreement, sale, lease, or rental.

318.    AFR engaged in these acts or omissions by failing to comply with common law and statutory requirements for adequate data security, including Section 5 of the FTCA and the Maryland Personal Information Protection Act, Md. Comm. Code § 14-3503.

- 75 -

319.     Plaintiff Micah and the Maryland Class acted reasonably in relying on AFR's misrepresentations and omissions, described fully, *supra*, the truth of which they could not have discovered.

320.     As a result of AFR's unfair and deceptive acts and practices, Plaintiff Micah and the Maryland Class have suffered and will continue to suffer injury, losses of money or property, and monetary and non-monetary damages as alleged more fully above.

321.     Plaintiff Micah and the Maryland Class seek all relief allowed under law for these violations, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

**COUNT XI**
**MARYLAND PERSONAL INFORMATION PROTECTION ACT, Md. Code Ann. § 14-3501, *et seq.***
**(On behalf of Plaintiffs and the Alternative Maryland Class)**

322.     Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

323.     Plaintiff Micah brings this claim on behalf of herself and the alternative Maryland Class.

324.     Under the Maryland Personal Information Protection Act ("MPIPA"), Md. Code Ann. Com. Law § 14-3503(a), "[t]o protect Personal Information from unauthorized access, use, modification, or disclosure, a business that owns or licenses Personal Information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of Personal Information owned or licensed and the nature and size of the business and its operations."

325.     AFR is a business that owns or licenses computerized data that includes Personal Information as defined by Md. Code Ann. Com. Law § 14-3501(b)(1).

326.    Plaintiff Micah and the Maryland Class are "individuals" and "customers" as defined in Md. Code Ann. Com. Law §§ 14-3502(a) and 14-3503.

327.    Plaintiff Micah's and the Maryland Class's Personal Information includes "[h]ealth information" and "[p]ersonal information" as covered under Md. Code Ann. Com. Law §§ 14-3501(d)-(e).

328.    AFR did not maintain reasonable security procedures and practices appropriate to the nature of the Personal Information owned or licensed and the nature and size of its business and operations in violation of Md. Code Ann. Com. Law § 14-3503.

329.    The Data Breach was a "breach of the security system" as defined by Md. Code Ann. Com. Law § 14-3504(1).

330.    Under Md. Code Ann. Com. Law § 14-3504(b)(1), "[a] business that owns or licenses computerized data that includes Personal Information of an individual residing in the State, when it discovers or is notified of a breach of the security system, shall conduct in good faith a reasonable and prompt investigation to determine the likelihood that Personal Information of the individual has been or will be misused as a result of the breach."

331.    Under Md. Code Ann. Com. Law §§ 14-3504(b)(2) and 14-3504(c)(2), "[i]f, after the investigation is concluded, the business determines that the breach of the security of the system creates a likelihood that personal information has been or will be misused, the owner or licensee of the computerized data shall notify the individual of the breach" and that notification "shall be given as soon as reasonably practical but not later than 45 days after the business discovers or is notified of the breach of a security system."

332.     Because AFR discovered a security breach and had notice of the security breach, AFR had an obligation to disclose the security data breach in a timely and accurate fashion as mandated by Md. Code Ann. Com. Law §§ 14-3504(b)(2) and 14-3504(c)(2).

333.     After discovering the Data Breach, AFR waited an unreasonable amount of time before notifying Plaintiff Micah and the Maryland Class.  By failing to disclose the Data Breach in a timely and accurate manner, AFR violated Md. Code Ann. Com. Law §§ 14-3504(b)(2) and 14-3504(c)(2).

334.     As a direct and proximate result of AFR's violations of Md. Code Ann. Com. Law §§ 14-3504(b)(2) and 14-3504(c)(2), Plaintiff Micah and the Maryland Class have suffered and will continue to suffer damages.

335.     Pursuant to Md. Code Ann. Com. Law § 14-3508, AFR's violations of Md. Code Ann. Com. Law §§ 14-3504(b)(2) and 14-3504(c)(2) are unfair or deceptive trade practices within the meaning of the Maryland Consumer Protection Act (codified at Md. Code Ann. Com. Law § 13-301 et seq.) ("MCPA") and are subject to the enforcement and penalty provisions contained within the MCPA.

336.     Plaintiff Micah and the Maryland Class seek relief under Md. Code Ann. Com. Law § 14-3508, including actual damages and attorneys' fees.

## CLAIM ON BEHALF OF THE ALTERNATIVE ILLINOIS CLASS

### COUNT XII
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### ("CFA"), 815 Ill. Comp. Stat. § 505/1, *et seq.*
### (On Behalf of Plaintiffs and the Alternative Illinois Class)

337.     Plaintiffs repeat the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

338.    Plaintiff Stuart brings this claim on behalf of himself and the alternative Illinois Class.

339.    Plaintiff Stuart and the Illinois Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).  Plaintiff Stuart, the Illinois Class, and AFR are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

340.    AFR is engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). AFR engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

341.    AFR engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of its services in violation of the CFA, including: (1) failing to maintain adequate data security to keep Plaintiff Stuart's and the Illinois Class's sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting materials facts to Plaintiff Stuart and the Illinois Class regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiff Stuart and the Illinois Class; (3) failing to disclose or omitting materials facts to Plaintiff Stuart and the Illinois Class about AFR's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiff Stuart and the Illinois Class; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff Stuart and the Illinois Class's PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

4888-8709-5336.v1

342.    These actions also constitute deceptive and unfair acts or practices because AFR knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff Stuart and the Illinois Class and defeat their reasonable expectations about the security of their PII.

343.    AFR intended that Plaintiff Stuart and the Illinois Class rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with AFR's offering of goods and services.

344.    AFR's wrongful practices were and are injurious to the public because those practices were part of AFR's generalized course of conduct that applied to the Illinois Class. Plaintiff Stuart and the Illinois Class have been adversely affected by AFR's conduct and the public was and is at risk as a result thereof.

*345.*    AFR also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff Stuart and the Illinois Class of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq.*

346.    As a result of AFR's wrongful conduct, Plaintiff Stuart and the Illinois Class were injured in that they never would have provided their PII to AFR, or paid for AFR's services, had they known or been told that AFR failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

347.    As a direct and proximate result of Defendants' violations of the CFA, Plaintiff Stuart and the Illinois Class have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments or services made to AFR or AFR's customers that Plaintiff Stuart and the Illinois Class would not have made had they known

of AFR's inadequate data security; lost control over the value of their PII; unreimbursed losses

relating to fraudulent charges; harm resulting from damaged credit scores and information; and

other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling

them to damages in an amount to be proven at trial.

348.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff Stuart and the Illinois Class

seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a

result of AFR's violations of the CFA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.    For an Order certifying the Nationwide Class, or alternatively, the Florida, Maryland, Illinois, and Pennsylvania Classes, and appointing Plaintiffs and their counsel to represent the certified Class and/or Classes;

B.    For equitable relief enjoining AFR from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PII, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting AFR from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring AFR to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring AFR to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless AFR can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring AFR to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs' and Class Members' personal identifying information;

- 81 -

v.      prohibiting AFR from maintaining Plaintiffs' and Class Members'PII on a cloud-based database;

vi.     requiring AFR to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on AFR's systems on a periodic basis, and ordering AFR to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring AFR to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring AFR to audit, test, and train its security personnel regarding any new or modified procedures;

ix.     requiring AFR to segment data by, among other things, creating firewalls and access controls so that if one area of AFR's network is compromised, hackers cannot gain access to other portions of AFR's systems;

x.      requiring AFR to conduct regular database scanning and securing checks;

xi.     requiring AFR to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiffs and Class Members;

xii.    requiring AFR to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring AFR to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with AFR's policies, programs, and systems for protecting PII;

4888-8709-5336.v1

    xiv.    requiring AFR to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor AFR's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

    xv.    requiring AFR to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

    xvi.    requiring AFR to implement logging and monitoring programs sufficient to track traffic to and from AFR's servers; and

    xvii.    for a period of ten years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate AFR's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of punitive damages;

F.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    For prejudgment interest on all amounts awarded; and

H.    Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

A jury trial is demanded by Plaintiffs and the putative Class Members as to all issues so triable.

DATED:  July 8, 2022        **CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
JAMES E. CECCHI
LINDSEY H. TAYLOR

_____
/s/ James E. Cecchi
JAMES E. CECCHI

- 83 -

4888-8709-5336.v1

5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

Stuart A. Davidson
Alexander C. Cohen
**ROBBINS GELLER RUDMAN
   & DOWD LLP**
120 East Palmetto Park Rd., Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000
Facsimile: (561) 750-3364
sdavidson@rgrdlaw.com
acohen@rgrdlaw.com

*Plaintiffs' Co-Lead Interim Class Counsel*

Blake Hunter Yagman
Gary M. Klinger
David K. Lietz
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Telephone: (516) 741-5600
Fax: (516) 741-0128
VManiatis@thesandersfirm.com
byagman@milberg.com
gklinger@milberg.com
dlietz@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252.0878
gklinger@milberg.com

David K. Lietz
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW

Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

Joseph M. Lyon
**THE LYON FIRM, LLC**
2754 Erie Avenue
Cincinnati, OH 45208
Phone: (513) 381-2333
Fax: (513) 721-1178
jlyon@thelyonfirm.com

Terence R. Coates
**MARKOVITS, STOCK & DEMARCO, LLC**
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com

Gary S. Graifman
Melissa R. Emert
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
T: (845) 356-2570
F: (845) 356-4335
ggraifman@kgglaw.com
memert@kgglaw.com

*Plaintiffs' Interim Class Counsel*

4888-8709-5336.v1